IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID GREESON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 1:05-1193-T |
| | ) | |
| JO ANNE BARNHART, the | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER AFFIRMING THE COMMISSIONER'S FINAL DECISION

David Greeson seeks judicial review of the Commissioner of Social Security's final decision determining that Greeson did not have a disability and therefore was not entitled to benefits under either Title II or Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 401, *et. seq.* & 1381, *et. seq.* Greeson contends that: (1) the record lacked substantial evidence supporting the ALJ's finding that Greeson retained the residual functional capacity ("RFC") to perform the full range of light work, and (2) the court should remand because Greeson was not represented by counsel at the administrative level. Both contentions are ultimately unpersuasive. Furthermore, because the final decision that Greeson was not disabled is supported by substantial evidence in the administrative record as a whole, this court AFFIRMS.

On February 4, 2002, Greeson filed an application for disability insurance benefits under Title II and an application for supplemental security income under Title XVI. (Administrative Record ("R.") at 59, 294). Greeson alleged that he became disabled on January 7, 1992, due to pain caused by two "slipped" discs and degenerative disc disease in his back. (R. at 67, 294). A Tennessee agency denied both applications initially and after Greeson's request for reconsideration. (R. at 34–47, 298–309).

On June 7, 2004, an administrative law judge ("ALJ") held a hearing. The agency informed Greeson of his right to legal representation both before (R. at 50–53) and on the day of (R. at 312–313) the hearing. Greeson decided to proceed without the assistance of counsel, and he signed a written form entitled "Waiver of Right to Representation." (R. at 57, 313). Greeson does not contest the validity of this particular waiver of counsel, *see, e.g., Allison v. Apfel*, No. 99-4090, 2000 U.S. App. LEXIS 22689, at *16–18 (6th Cir. Aug. 30, 2000) (unpublished) (citing, *inter alia*, *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1052 (6th Cir. 1983) and *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 855 (6th Cir. 1986)), and he does not claim that the ALJ failed to provide a "full and fair" administrative hearing, *see, e.g., Richardson v. Perales*, 402 U.S. 389 (1971); *Allison*, 2000 U.S. App. LEXIS 22689, at *16 (explaining the ALJ's obligation to provide social security claimants with fully developed records and fair hearings, and noting that the obligation rises to a "special duty" when a claimant is unrepresented) (citing *Lashley* and *Duncan* for both

propositions).[1]

At this hearing, the ALJ examined Greeson regarding Greeson's age, his educational and vocational backgrounds, his pain, his household chores and activities of daily living, his limitations, his sleeping habits, and his medical treatment history. (R. at 314–322). Greeson testified that he was forty-five years old with an eleventh grade education. (R. at 314). Greeson did not have any formal vocational training. (*Id.*).

Greeson testified that his past relevant work—*i.e.*, that work that Greeson had performed within the previous fifteen years[2]—included employment as a furniture upholster on an assembly line with Gaines Manufacturing Company. (R. at 315). Greeson worked for Gaines Manufacturing for approximately three and one-half to four years during the late 1980's and the early 1990's. (*Id.*). The ALJ found that this employment had required occasional lifting of up to fifty pounds. (R. at 24). If a couch "fell off the cart," Greeson (presumably with the help of a co-employee) was responsible for lifting the couch and for placing it back on the cart. (R. at 315). The couches weighed "around" seventy-five pounds or "more than that." (*Id.*). Greeson stopped working at Gaines in 1991 or 1992, in part because his father had passed away and his mother needed someone to help take care of her.

---

[1]Rather, Greeson essentially seeks remand on the ground that the ALJ's RFC finding "would" have been different if Greeson had not decided to forgo legal representation below. *See* Pl.'s Br. at 7. This is supposedly true because Greeson's hypothetical attorney might have done certain things before or during Greeson's hearing that Greeson failed to do on his own behalf—such as "develop[ing] the record by obtaining [RFC] statements from [Greeson's] treating sources, updat[ing] [Greeson's] medical records, guid[ing] Greeson's testimony, and follow[ing] up on the [February] 2004 MRI showing severe cervical disc problems." *See id.*

[2]In addition to the fifteen-year time frame, the regulations also define past relevant work as work that amounted to "substantial gainful activity" and that "lasted long enough for [the claimant] to learn to do it." 20 CFR 416.960(b)(1) ("Definition of Past Relevant Work").

(R. at 315, 317).

Greeson testified that he cannot work anymore because of constant pain in his back and neck. (R. at 315–316). He has struggled with this pain for more than twenty years, and the severity of the pain has increased gradually. (R. at 316). In recent years, the pain's once gradual progression has accelerated. (R. at 317). The pain affects Greeson's "legs and stuff" and causes headaches. (*Id.*). Depending on the seating, Greeson can sit in one place for an hour or more at a time. (R. at 317–318). Standing also presents difficulties for Greeson; if he has to stand in one spot, his tailbone begins to hurt. (R. at 318). He cannot stand for more than "a good thirty minutes" before he needs to sit down. (*Id.*). Sometimes, Greeson can walk without difficulty. Other times, he can walk only up to thirty minutes before he needs a break. (*Id.*).

To help alleviate the back and neck pain, Greeson takes prescription medication—Avinza (pain) and Flexeril (muscle relaxation). (R. at 316). He described the severity of the pain with the medication as a "five" on a scale of one through ten. (*Id.*). Without the medicine, Greeson testified that the pain's severity is a "seven" on the hypothetical scale. (*Id.*). During the twenty years since Greeson began dealing with this pain, he has taken care of his house. (R. at 317). He has performed normal household chores such as "mowing or something like that." (*Id.*).

Greeson can lift "almost anything," although his back "catch[es]" and his muscles contract if he lifts something "in a wrong way." (R. at 319). If this happens, he has to take a break. (*Id.*). He spends a typical day "sitting around watching TV all day." (*Id.*). He gets

4

his chores accomplished within "a few days" after starting them. (R. at 320). He mows the yard, helps his ex-wife clean the house, and cooks. (*Id.*). He drives around town and up to thirty or forty miles away from town, but he apparently becomes uncomfortable if he tries to drive longer distances. (*Id.*). He does not have any hobbies, and he is not a member of any religious or social organizations. (R. at 320–321). On some nights, Greeson's back pain causes him to experience difficulty sleeping. (R. at 320). In particular, he has trouble getting comfortable enough to fall asleep because his legs and feet "go numb" when he lies down. (R. at 321). On a bad night, Greeson sleeps no more than from three to four hours. (*Id.*).

Greeson testified that over the years his back and neck pain has been treated primarily by Dr. Daniel Sumrok, M.D. (R. at 321). Dr. Sumrok has referred Greeson to several other medical professionals as part of Sumrok's overall effort to "see what [can be done] to correct [the pain] or . . . make the pain more livable to where [Greeson] can go to work." (*Id.*).[3] However, neither epidural injections nor nerve blocks have been completely successful, and a neurosurgeon has told Greeson that back surgery will make his pain worse. (*Id.*). The medications that Greeson takes provide "[s]o-so relief," reducing but not eliminating his allegedly disabling pain. (R. at 316); *see also supra*, at 4.

Greeson gave the following closing remarks at the hearing:

> . . . [The doctors have been] all of the time telling me it was either strained muscles or torn ligaments. And I knew—I could feel it within my own body, you know, that

---

[3]Dr. Sumrok has never opined that Greeson cannot work, so this part of Greeson's testimony should not be read to reflect the views of Dr. Sumrok regarding the extent of Greeson's limitations.

> it was something more to it than just that.  So I've had problems getting doctors to go any further.  They just say well, its disks.  Just keep doing what I'm telling you to do and it will get better and it doesn't.  So I've been working on this for years and I'm just now getting to the point where I'm—where I can finally tell the doctors, look, I've done nothing to strain my back, or tear a ligament, or anything so now you've got to look somewhere else.  And now they're finally finding these other problems in my back finally.

(R. at 322).

Based on the evidence in the administrative record, which included Greeson's testimony and the objective medical evidence that Greeson and the Commissioner had submitted, the ALJ issued a written opinion on August 13, 2004.  (R. at 20–27).  The ALJ first found that Greeson was not insured for disability insurance benefits under Title II after December 31, 1996; thus, the ALJ noted that Greeson would be required to establish disability on or before that date to qualify for Title II disability benefits.  (R. at 21).  Next, the ALJ found that Greeson had not engaged in substantial gainful activity, *see* 42 U.S.C. § 416(i), since his alleged onset date—January 7, 1992.  (*Id.*).  Third, the ALJ found that, while Greeson suffered from "severe impairments," those impairments neither singly nor in combination met or equaled one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  (R. at 22).

Consistent with the Social Security Act and the Commissioner's implementing regulations, the ALJ then considered whether Greeson retained the functional capacity to perform his past relevant work as a furniture upholsterer.  (R. at 24) (citing 20 CFR §§ 404.1545, 416.945, and Social Security Ruling 96-8p).  After considering Greeson's

allegations, the medical evidence, and the medical opinions in the record, the ALJ found that Greeson retained the residual functional capacity ("RFC") to perform the full range of light work: *i.e.*, work that involves lifting no more than twenty pounds at a time. (R. at 22–24); 20 CFR 404.1567(b). Because Greeson's upholstering duties required regular lifting of fifty pounds, the ALJ found Greeson unable to perform the physical demands of his past relevant work as a furniture upholsterer. (R. at 24).

The ALJ then proceeded to consider whether—given Greeson's RFC, age, education, and work experience—there was a significant number of other jobs in the national economy that Greeson could perform. (*Id.*). The ALJ considered each of the aforementioned factors and determined that Greeson could still perform a significant number of jobs that existed in the national economy. (R. at 25). To reach that conclusion, the ALJ applied the Medical-Vocational Guidelines that are published at 20 CFR Part 404, Subpart P, Appendix 2 (the "Grids"). (*Id.*).[4]

Because Greeson could perform jobs that existed in significant numbers in the national economy, the ALJ found him not disabled. This decision became final on May 11, 2005, when the Appeals Council denied discretionary review. (R. at 5). Greeson then sought review in this court. *See* 42 U.S.C. § 405(g).

I.

---

[4]Application of the Grids to direct a finding of non-disability by taking "administrative notice" of the existence of other jobs in the national economy is appropriate if a claimant's conditions do not present any nonexertional limitations. *See, e.g., Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

This court will leave intact the ALJ's factual findings unless they are not supported by substantial evidence in the administrative record as a whole. 42 U.S.C. § 405(g); *see also, e.g., Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Substantial evidence is more than a scintilla, but less than a preponderance, of evidence. *E.g., Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996). A more precise and useful description of the deferential substantial evidence standard of review is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Pursuant to this standard, the court will not reverse a finding of fact made by the agency simply because there is evidence in the administrative record that supports a contrary finding. *E.g., Longworth*, 402 F.3d at 595; *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (quoting *Garner v. Heckler*, 745 F.3d 383, 387 (6th Cir. 1984) ("[Reviewing courts] may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.")).[5]

Greeson is not entitled to benefits unless he proves that he was disabled as defined by the Social Security Act and the regulations promulgated thereunder. *See* 42 U.S.C. § 423(d)(1)(A); *Boyes v. Sec'y of Health & Hum. Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); 20 CFR § 404.1512. The Social Security Act, in pertinent part, defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

---

[5]Notwithstanding judicial deference to the agency's findings of fact, the court may reverse if incorrect legal standards were applied to those facts. *C.f.*, *e.g., Stead v. Comm'r of Soc. Sec.*, 352 F. Supp. 2d 807, 813–814 (E.D. Mich. 2005) (reversing for legal error).

which has lasted or can be expected to last for a continuous period of not less than twelve months[.]" 42 U.S.C. § 423(d)(1)(A). The agency that Congress charged with executing this statutory definition has established a five-pronged, sequential evaluation scheme to determine if a particular social security claimant is disabled. 20 CFR §§ 404.1520, 416.920; *see generally Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). The agency must first determine if an individual is engaging in substantial gainful activity; if so, the claimant is not considered disabled. 20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b). If the individual is not engaging in such activity, the agency considers whether the individual has established the existence of a "severe" impairment that meets the twelve-month duration requirement; if none of the claimant's impairments satisfy both the severity and the duration requirements, the analysis ceases. §§ 404.1520(a)(4)(ii) & (c), 416.920(a)(4)(ii) & (c). If the claimant is not working and has one or more severe impairments, the agency then determines if any of those impairments, or all of them, are serious enough to presume conclusively that the claimant is disabled. §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d). If not, the agency must determine if the claimant's residual functional capacity (RFC)—defined as the most the claimant can still do despite all of his or her limitations, *see* §§ 404.1545(a), 416.945(a)—prevents the claimant from performing his or her past relevant work; a claimant who can return to his or her past relevant work will not be found disabled. §§ 404.1520(a)(4)(iv) & (e)–(f), 416.920(a)(4)(iv) & (e)–(f). If an individual's RFC precludes performance of past relevant work, the agency considers the limitations imposed by the RFC, along with the individual's age, education, and work experience, to determine

if the individual can perform other work that exists in significant numbers in the national economy. §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).[6] If such other work exists, the regulations mandate a denial of benefits.

## II.

As discussed *supra*, at 6–7, the ALJ conducted this sequential evaluation and concluded that Greeson had not shown that he was "disabled," within the meaning of the statute and the regulations, as a result of hypertension and back and neck pain. (R. at 26–27). The only specific objection Greeson makes to the ALJ's findings of fact is that the ALJ erred in finding Greeson capable of performing the full range of light level work. Pl.'s Br. at 5; Pl.'s Reply at 1. To support this submission, Greeson points to a February 10, 2004, magnetic resonance imaging ("MRI") report that was ordered by Dr. Sumrok. Greeson describes the MRI as "showing severe cervical disc" problems. Pl.'s Br. at 7.

The MRI did confirm that, on February 10, 2004,

> . . . [Cervical]6 [was] displaced anteriorly on C7 approximately 3mm. . . . The C6 disc [was] narrowed with large anterolateral osteophytes. The anterior posterior diameter of the spinal canal at the C6-7 level [was] diminished approximately 1/3. There [was] slight anterior posterior flattening of the cord at this level. The neuro foramina at C6-7 appear[ed] narrowed.
>
> IMPRESSION: Diffuse Degenerative Disc Disease With Significant Degenerative Subluxation at C6-7 and Resulting Compromise of the Spinal Canal and Neuro Foramina.

R. at 271. According to Greeson, this MRI renders the ALJ's RFC finding that Greeson

---

[6] There are, of course, certain exceptions to this rigid analytical framework, but they are not relevant in this case. *See, e.g.*, 20 CFR § 404.1562.

could perform light work unsupported by substantial evidence. Pl.'s Br. at 6. He notes that the only light work assessment in the record that the ALJ specifically cited to support the RFC was performed by a Tennessee agency consultant physician on October 15, 2002—approximately sixteen months before the February 2004 MRI. *Id.*; (R. at 251–257). This assessment obviously did not have the benefit of the February 2004 MRI; moreover, while the medical consultant acknowledged Greeson's diagnosis of degenerative disc disease at C6-7, he apparently did not mention any "subluxation" or other abnormality in either the cervical or the lumbar spine. (R. at 252–253). If these additional disc problems had been taken into account by the consultant, Greeson maintains, "it is highly unlikely that [the consultant] would have found [Greeson] capable of lifting twenty pounds frequently and ten pounds occasionally; unlimited pushing and pulling; and unlimited reaching, handling, and finger manipulation." Pl.'s Br. at 6 (citing the October 2002 assessment). Given this apparent defect in the assessment, Greeson argues that the ALJ's reliance on that assessment causes the ALJ's RFC determination to constitute reversible error.

The court is not convinced that it should reverse and remand to the agency based on this perceived defect in the ALJ's precise method of arriving at the challenged RFC finding. The essential question for this court is whether that finding—and the ultimate final decision—is supported by substantial evidence in the administrative record *as a whole*, not whether the particular assessment in question was or was not adequate standing alone. *See Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978) ("The determination of whether there is substantial evidence to support the findings of the Secretary depends on the record as a

whole. We may not focus and base our decision entirely on a single piece of evidence, and disregard other pertinent evidence."). Regardless of the probative value of the October 2002 assessment that the ALJ specifically mentioned, the question remains whether the "other pertinent evidence" of record, as a whole, is adequate to conclude that Greeson can perform light work. If so, the court may assume that the ALJ was cognizant of this other supporting evidence and that such other evidence also contributed to the RFC determination. *C.f. Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 2006 U.S. App. LEXIS 3303, at *32–33 (6th Cir. Feb. 9, 2006) (unpublished) (quoting *Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted . . . .") (citation and internal quotation marks omitted)); *see also id.* at *32–33 (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.") (citation omitted)). In light of these principles of review, the significance of the February 2004 report showing "subluxation at C6-7 and resulting compromise of the spinal canal and neura foramina" is not as substantial as Greeson alleges. Several reasons support this conclusion.

To establish an entitlement to Title II disability insurance benefits based on his back problems,[7] Greeson was required to show that he was legally disabled while he was insured

---

[7] Although Greeson also suffers from hypertension, his arguments for remand are based solely on the extent of the limitations caused by the problems in his back.

for such benefits. 42 U.S.C. § 423(a)(1)(A); *see, e.g., Key v. Callahan*, 109 F.3d 270, 273–274 (6th Cir. 1997). Greeson does not dispute the agency's finding that his insured status had expired December 31, 1996, and that he had to prove a disability on or before that date to qualify. (R. at 21). For the purpose of satisfying that burden, the MRI showing the condition of Greeson's cervical discs in *February 2004* was only marginally relevant, if at all. *See Key*, 109 F.3d at 273 (denying benefits even though evidence "arguably . . . would support a conclusion that claimant is disabled as of today"); *see also Strong v. Soc. Sec. Admin.*, 88 Fed. App'x 841, 845 (6th Cir. Feb. 3, 2004) (unpublished) ("Evidence of disability obtained after the expiration of insured status is generally of little probative value.") (citing *Cornette v. Sec'y of Health & Hum. Servs.*, 869 F.2d 260, 264 n.6 (6th Cir. 1988)).

The February 2004 MRI also does not require a remand with respect to Greeson's application for supplemental security income. Although the specific October 2002 assessment cited by the ALJ does not discuss Greeson's herniated discs,[8] an August 2002 RFC assessment by a different state agency physician did acknowledge Greeson's herniated discs, (R. at 158–166); notwithstanding those underlying anatomical defects, the consultant opined that the resulting pain did not prevent Greeson from performing light work. (R. at 159). The court finds it *highly likely* that the February 2004 MRI would not have altered the consultant's opinion, because, as the Commissioner points out, the February 2004 MRI was

---

[8]Nor does the assessment of Dr. Donita Keown, M.D., who performed a consultative examination on behalf of the Tennessee agency that initially processed Greeson's claim, fully reflect the state of Greeson's back in 2002. Indeed, Dr. Keown explicitly stated that "views of the C-spine and lumbosacral spine are pending" and that the assessment was "based on evidence available for review at the time of this dictation." (R. at 156). The court therefore agrees with Greeson's argument that Dr. Keown's incomplete assessment did not justify the ALJ's RFC finding.

not by any means the first indication of Greeson's cervical disc problems.  Comm'r Br. at 8. Rather, in May of 2001, an X-ray ordered by Dr. Bradford Wright, M.D., showed "degenerative disc disease and degenerative subluxation at C6/7 with spondylosis [a]ffecting the left side of the spinal canal and left neural foramen, (R. at 146)[;]" Dr. Sumrok, who had referred Greeson to Dr. Wright, acknowledged in December of 2001 that Greeson suffered from degenerative disc disease and "two slipped discs" in the cervical and lumbar regions, respectively, (R. at 183).  Remarkably, neither of these physicians imposed any restrictions on Greeson that would have called into question the August 2002 RFC assessment.  In the absence of such evidence, the August 2002 assessment was itself "adequate to support [the ALJ's] conclusion" that Greeson could perform light work.  The fact that the ALJ did not explicitly mention the August 2002 assessment is immaterial.  *See Hephner v. Mathews, supra*, at 12 (instructing reviewing courts to look at the whole record to determine if an ALJ's finding is substantially supported).

In addition to this evidence supporting the ALJ's RFC finding, the *lack* of medical evidence regarding the extent of Greeson's alleged disability ultimately compels the ALJ's decision that Greeson is not entitled to benefits.  Greeson's claim—that he is unable to work because of the pain allegedly caused by his degenerative disc disease and his two herniated discs—is governed by *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847 (6th Cir. 1986); *see, e.g., Bell v. Barnhart*, 148 Fed. App'x 277, 285–286 (6th Cir. July 20, 2005) (unpublished) ("In [the Sixth] [C]ircuit, complaints of pain are evaluated pursuant to *Duncan*

. . . ."). Applying 20 CFR § 404.1529,[9] the *Duncan* panel held that, in evaluating disability claims based on subjective complaints of pain, courts should conduct a two-part inquiry. *See* 801 F.2d at 853. First, courts should determine "whether there is objective medical evidence of an underlying medical condition." *Id.* If so, the question becomes "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* Thus, as the Commissioner correctly points out, "[t]he fact that Greeson had a herniated disc is not the critical factor in this case." Comm'r Br. at 8. [T]he critical question is what are [Greeson's] limitations from his condition." *Id.*

Greeson's degenerative disc disease and his two herniated discs are underlying medical conditions that are verified by the record. Greeson fails, however, to explain how the severity of the pain allegedly caused by these conditions is confirmed by the objective medical evidence. In the same vein, "no medical evidence has been presented suggesting that [degenerative disc disease and herniated discs at C6-7 and L4-5] can reasonably be expected to produce the alleged disabling pain." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (applying *Duncan*). Thus, because the severity of Greeson's pain could not be substantiated by the medical evidence alone, the Commissioner was entitled consider other factors, such as "daily activities and the type and dosage of medication taken."

---

[9]*See also* 20 CFR § 416.929.

15

*Id.* (citing 20 CFR § 404.1529(c)(3)). Furthermore, "[t]he absence of objective medical evidence makes credibility a particularly relevant issue, and in such circumstances, this court will generally defer to the Commissioner's assessment when it is supported by an adequate basis." *Id.* (citing *Blacha v. Sec'y of Health & Hum. Servs.*, 927 F.2d 228, 230 (6th Cir. 1990)).

The ALJ found Greeson's allegations regarding the limitations imposed by pain not totally credible. (R. at 26). This finding is "particularly relevant" and supported by the record. Greeson testified that he quit working in 1991 or 1992, not because of unbearable pain, but because his mother needed his assistance. (R. at 315, 317). No surgeries have been recommended or performed in connection with Greeson's degenerative disc disease or his herniated discs during the twenty years in which he has suffered from pain. (R. at 24). Instead, he has been treated "conservatively" with medication, epidural injections, and nerve blocks. (R. at 24, 316, 321). While no course of treatment has eliminated Greeson's pain completely, he admits some relief with the pain medication and the muscle relaxant. (R. at 316). Since quitting work, he has taken care of his house (R. at 317), performing chores such as "mowing" the yard (*Id.*), cleaning the house (R. at 320), and cooking (*Id.*). By his own admission, he "*can lift almost anything* you might say," although if he lifts something in the "wrong way" he must take a break. (R. at 319) (emphasis provided). The ALJ was within his discretion in determining that Greeson's history of conservative treatment, his daily activities, and his ability to lift "almost anything," were all factors inconsistent with pain that rose to the level of a disability under the *Duncan* framework. *Accord Walters*, 127 F.3d at

531–532.

In summary, despite the February 2004 MRI, the administrative record as a whole provides adequate support for the ALJ's RFC determination and his ultimate decision that Greeson was not disabled because of back and neck pain. Therefore, the court declines Greeson's effort to obtain a remand based entirely on the February 2004 MRI.

III.

Greeson's real argument is that, because he was not represented by an attorney at the administrative level, this court should remand his claim to the agency for further development of the record. *See* Pl.'s Br. at 7; Pl.'s Reply at 2–3. In making that request, Greeson avoids a direct challenge the validity of his waiver of counsel, (R. at 50–53, 57, 312–313); Pl.'s Br. at 7 (noting that it is "unfortunate" that Greeson *chose* to represent himself); and, he does not contend that this ALJ failed to comply with the " 'special duty to develop the record and to ensure a fair hearing . . . when the claimant is unrepresented,'" *see Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986). Instead, he notes the possibility that, if he had been represented below, his attorney might have made some strategical decisions that Greeson did not make. In particular, this hypothetical attorney might have "developed the record by obtaining [RFC] statements from his treating sources, updated his records, guided his testimony, and followed up on the [February 2004] MRI showing severe cervical disc problems." Pl.'s Br. at 7. If these decisions had been made, Greeson asserts that "the ALJ would not have been able to find [Greeson capable of light work." *Id.*

This line of argument is unhelpful. A social security claimant is entitled to waive the statutory right to counsel at the administrative level. *Allison v. Apfel*, No. 99-4090, 2000 U.S. App. LEXIS 22689, at *15–19 (6th Cir. Aug. 30, 2000) (unpublished) (citations omitted); *Duncan*, 801 F.2d at 855–856; *Lashley v. Sec'y of Health & Hum Servs.*, 708 F.2d 1048, 1052 (6th Cir. 1983) (citations omitted). This choice would be meaningless if a claimant could obtain a remand in Federal District Court as a matter of course without showing either that his waiver was coerced or invalid or that the ALJ did not provide a fair hearing. Greeson has not attempted to make either showing, arguing instead that the court should remand based on the mere speculation that his chances of success below would have been increased relatively if he had been represented by an attorney. Such general and *post hoc* observations about the relative benefits of counsel, however, are insufficient and do not amount to the type of prejudice that conceivably could justify a remand in any case. *C.f. Lovett v. Comm'r of Soc. Sec.*, No. 95-5703, 1996 U.S. App. LEXIS 10129, at *8 (6th Cir. March 26, 1996) (unpublished) (rejecting request for remand based on speculation that an attorney might have "mounted a successful attack Ms. Matheny's version of Mrs. Lovett's daily activities"). To conclude otherwise would eviscerate the applicable rule of law—"[t]he mere fact that a claimant is acting without counsel . . . is not grounds for reversal." *Id.* at *7 (citing *Holden v. Califano*, 641 F.2d 405, 408 (6th Cir. 1981)).

Greeson validly waived counsel, was provided a fair hearing, and has not demonstrated any relevant form of prejudice as a result of self-representation. The court therefore rejects Greeson's effort to obtain a remand on this basis.

18

IV.

For the reasons stated, the Commissioner's final decision that Greeson did not suffer a disability is AFFIRMED. The Clerk is directed to prepare final judgment accordingly.

IT IS SO ORDERED.

 s/ **James D. Todd**
JAMES D. TODD
UNITED STATES DISTRICT JUDGE